IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

LISA WINSTEAD                                                                      PLAINTIFF

v.                                                          CIVIL ACTION NO. 1:23-CV-30-SA-RP

BOEING AEROSPACE OPERATIONS, INC.
d/b/a AURORA FLIGHT SCIENCES CORPORATION                    DEFENDANT

ORDER AND MEMORANDUM OPINION

Lisa Winstead initiated this civil action on February 28, 2023. Her Complaint [1] brings a race discrimination claim under Title VII and 42 U.S.C. § 1981 against Boeing Aerospace Operations, Inc. d/b/a Aurora Flight Sciences Corporation ("Aurora"). Before the Court is Aurora's Motion for Summary Judgment [36]. The Motion [36] has been fully briefed and is ripe for review. Having reviewed the parties' filings and the applicable authorities, the Court is prepared to rule.

*Relevant Factual and Procedural Background*

Winstead, a White woman, worked at Aurora from August 2018 until her termination on April 8, 2022. Aurora is an airplane parts manufacturer with a facility in Columbus, Mississippi. Winstead was a Human Resources Business Partner and the sole HR representative at the Columbus site. After a restructuring of the HR department at an unspecified time, Winstead began reporting to HR Director Ashley McElwain (White), who worked in Manassas, Virginia. In January 2022, McElwain was promoted to Chief Human Resources Officer. April Allen (White) then assumed McElwain's position as HR Director in February 2022 and Winstead began reporting to her.[1] Allen and McElwain both remained located in Virginia after their promotions.

---

[1] Prior to Allen's promotion, Allen and Winstead were peers in the HR department. Allen previously worked as a recruiter and HR manager for the Virginia site.

As an HR Business Partner, Winstead's duties included supporting site managers; understanding, enforcing, and following company policies; and investigating and preparing reports on employee concerns. Winstead was additionally tasked with reviewing and approving immediate recognition awards. Immediate recognition awards are $100 bonuses given to employees for performing tasks beyond the scope of their ordinary job duties. To receive an award, an employee is nominated by another employee for recognition, HR approves the award, and the employee then receives the award at a site-wide monthly meeting. At her deposition, Winstead testified that recognition awards were approved once per month, which, per Winstead, meant that an employee may not receive the award until five or six weeks after nomination in some instances.

In January 2022, an issue arose regarding immediate recognition awards for two Black IT employees that Winstead had not approved.[2] At her deposition, Winstead alleged that she had not approved the awards because she believed that the employees had been nominated for work within the normal scope of their job duties. McElwain testified at her deposition that she told Winstead that the awards should be approved because Aurora's practice was to approve awards similar to those at issue. According to Allen's deposition testimony, after McElwain was promoted and Allen assumed her position, Allen also instructed Winstead to approve the two awards.

Winstead testified in contradiction to McElwain and Allen. In short, Winstead testified that she asked McElwain and Allen several times whether the awards should be approved or whether they should change the guidelines to allow the nominations to qualify for approval. She alleged that McElwain and Allen continuously told her, "[I]t's on hold. We haven't decided." [36], Ex. 1 at p. 52. Winstead testified that when she was finally instructed to approve the awards, she did not immediately approve them due to "the timing issue" that allegedly caused a delay in receipt of the

---

[2] Prior to January 2022, Winstead received good performance reviews and high ratings for harmony with employees.

2

awards. *Id.* She contended that the employees would not have received the recognition any sooner had she approved the awards immediately.

Winstead further alleged that she was instructed to make an exception to company guidelines and approve the awards only because the employees complained that her failure to approve them was race-related. Winstead testified that she asked the employees to reword their nominations so that she could approve them, and this prompted IT Manager LeRoi Washington (Black) to complain that Winstead was not approving the awards due to the employees' race.[3] Winstead's testimony suggests that she ultimately approved the awards but did so belatedly. McElwain and Allen provided conflicting statements as to whether Winstead ever approved the awards.[4]

Separately, in February 2022, Ariel Johnson-Davidson (Black) requested that Winstead put information regarding Black History Month on the electronic bulletin board. Johnson-Davidson was a Senior Engineer at Aurora and the on-site representative for the Boeing Black Employee Association at the time. According to her declaration, Johnson-Davidson had received approval for the display from Plant Manager Luke Colville, but Colville instructed her to discuss it with Winstead. Johnson-Davidson alleges that Winstead "was hesitant to allow it and said she would need to discuss it with others first." [36], Ex. 5 at p. 1-2.

---

[3] For context, Washington was located in Manassas, but he supervised two IT employees in Mississippi and was chairman of the Boeing Black Employee Association at the time. The Boeing Black Employee Association was one of seven employee resource groups. Employee resource groups meet to discuss issues that are important to them, provide support like resume assistance, and hold employee-led events. The Boeing Black Employee Association was made up of Black employees and employees of other races. As chairman, Washington at times communicated with employees that were not part of the IT department.

[4] During her deposition, McElwain alleged that Winstead never approved the awards. On the other hand, in the statement she provided as part of Aurora's internal investigation, McElwain alleged that Winstead approved the awards belatedly. Allen's statement provides that Winstead approved the awards on the day she was terminated.

At her deposition, Winstead testified that she was not aware that Colville had approved Johnson-Davidson's request because Colville's executive assistant did not send her notes from a meeting that occurred between Johnson-Davidson and Colville.[5] Thus, according to Winstead, she informed Johnson-Davidson that she did not have the authority to put things on the bulletin board and that she would need to run it by Colville. In any event, Johnson-Davidson complained to Colville about the bulletin board issue because she alleged that similar displays had been approved in the past.[6]

According to Johnson-Davidson's declaration, Colville then scheduled a meeting between himself, Johnson-Davidson, and Winstead. Johnson-Davidson alleges that at that meeting, Winstead stated that she was "'raised to be racist' but trying to learn." *Id.* at p. 2. Johnson-Davidson contends that the statement concerned her, and she later told Colville that she did not feel she could trust Winstead. Johnson-Davidson further alleges that around that time, she learned that Winstead began texting employees to ask if they thought she was racist.

At her deposition, Winstead alleged that she had a discussion with Allen regarding her concern that Johnson-Davidson thought she was racist. Winstead testified that she told Allen that "[w]e all have biases" and that she had been asking employees whether she was biased or unapproachable—not whether she was racist. [36], Ex. 1 at p. 80. Winstead denied telling anyone

---

[5] Jeanne Pushis (White) was Colville's executive assistant. At her deposition, McElwain alleged that the "drama" over the bulletin board was an issue between Winstead and an employee of the same race. [36], Ex. 2 at p. 33-34. In the statement provided during Aurora's internal investigation into Winstead's termination (discussed below), McElwain specified that the employee of the same race was Pushis. McElwain alleged that Winstead and Pushis had been arguing over the bulletin board and "sending each other emails blaming each other for things and cc'ing [Colville] to use him as the mediator." [40], Ex. 7 at p. 6. McElwain alleged that she "talked to [Winstead] about drama and that as the HR person at the site, she needed to make that stop." *Id.*

[6] At his deposition, when asked what specific complaints Johnson-Davidson had about Winstead, Colville did not discuss the bulletin board incident. Colville broadly testified that Johnson-Davidson did not feel comfortable during conversations with Winstead. He testified that Johnson-Davidson felt that the tone of conversations between her and Winstead changed when he was not in the room.

4

that she was "raised racist," instead contending that she said she was "raised in Mississippi." *Id.* at p. 105. Due to her upbringing in Mississippi, according to Winstead, she asked employees for their input to ensure that she was not making decisions based on prejudices.

On March 9, 2022, Allen emailed Winstead links to two unconscious bias trainings to be completed by March 18, 2022. At her deposition, Winstead testified that Allen told her she was required to take the training because Johnson-Davidson complained that she was biased and unapproachable. Winstead completed the trainings on time and told Allen that she enjoyed them and that everyone should complete them.

Separately, in February or March 2022, Winstead was involved in discussions regarding Johnson-Davidson's request for a promotion.[7] Johnson-Davidson had recently obtained a master's degree, which made her eligible for a promotion, and she protested not receiving a promotion soon after she obtained the degree. At her deposition, McElwain testified that Aurora has no explicit timeline as to when eligible employees receive promotions, but the company routinely considers them. According to McElwain, Johnson-Davidson's promotion was expedited because she had an offer from another company and Aurora wanted to retain her as an employee.

At her deposition, Winstead testified that she believed Johnson-Davidson's promotion violated Aurora's guidelines. Winstead alleged that the company had a promotion cycle wherein managers nominated their employees for promotion and budget holders then made the final promotion decisions. She did not specify the length or frequency of each promotion cycle.

Though the timeline of conversations regarding Johnson-Davidson's promotion are somewhat unclear, it appears that Winstead first learned of Johnson-Davidson's request from Jared Lamberson, Johnson-Davidson's manager. According to Winstead, Lamberson told her that

---

[7] The parties interchangeably refer to this employment decision as a promotion and a raise. The Court will refer to it as a promotion for uniformity.

Johnson-Davidson was leaving due to the other job offer, being treated unfairly, and because Winstead was biased and unapproachable. Winstead alleged that she decided to investigate the allegation of unfair treatment and called a meeting between herself, Colville, and Johnson-Davidson. Winstead testified that she asked Johnson-Davidson to stay at Aurora and attempted to sympathize with her regarding feeling underpaid. Winstead contends that she told Johnson-Davidson that production employees were previously underpaid, but she fought for them to receive raises. Johnson-Davidson reported to McElwain that Winstead told her that minorities were being underpaid. McElwain testified that she did not think Winstead would have made that exact statement, but she did think that Winstead made statements regarding how other employees were paid.

Winstead testified that she also had a conversation with Johnson-Davidson and Lamberson regarding Johnson-Davidson's promotion request. Winstead allegedly told Johnson-Davidson that she and Lamberson had already discussed nominating her for a promotion, but they did not plan to nominate her until later in the year. According to Winstead, Johnson-Davidson told her and Lamberson that she believed she was being denied the promotion due to her race. Johnson-Davidson thereafter received the promotion. Winstead testified that she felt that Johnson-Davidson's ultimate promotion was not an attempt to retain a valuable employee, but an exception made to company guidelines due to a complaint of racism.

Additionally, Winstead testified that after Johnson-Davidson was promoted, Winstead told McElwain, Colville, and others that she disagreed with the timing of the decision and questioned McElwain's judgment. She told them that she felt McElwain and Eric Thompson (the budget holder) overrode Lamberson's authority by approving the promotion.

Around this time, Winstead also had conversations with Ian Bilyi, an engineering director located in Manassas. At her deposition, McElwain testified that Winstead shared an employee's protected health information with Bilyi. Specifically, McElwain alleged that Winstead told Bilyi about an employee named Sarah having a reaction to the COVID vaccine. McElwain testified that "it is not standard practice nor appropriate for an HR person to share medical information with a manager unless there is a specific need to know." [36], Ex. 2 at p. 59. For her part, Winstead testified that she recalled discussing Sarah with Bilyi several times, but she denied telling him that Sarah had a reaction to the COVID vaccine.

In early April 2022, Allen traveled to Mississippi to conduct a site visit after assuming her new role as HR Director. At her deposition, Allen testified that while she was en route to Mississippi, she received an email from IT Manager LeRoi Washington regarding IT employee Chris McGee (Black). Washington relayed to Allen that McGee was resigning due to his complaints about Winstead. At his deposition, Washington testified that McGee felt he was unable to negotiate his salary with Winstead when he was initially hired. He further testified that McGee felt that he would not be able to get promoted because he "wouldn't get a fair shake with [Winstead]." [40], Ex. 11 at p. 23. According to Washington, McGee felt that Winstead was not "open to him or open to African American employees." *Id.* at p. 25.

When Allen arrived in Mississippi, she interviewed McGee. At her deposition, Allen testified that McGee described Winstead as dismissive because she kept her door closed and failed to follow up when he made repeated attempts to talk with her. According to the statement Allen submitted as part of Aurora's internal investigation into Winstead's termination (discussed below), McGee additionally alleged that "during All Hands meetings when [Winstead] would announce

who received recognition, if the recognition was for a Black employee, [Winstead] acted as if she did not want to recognize that person and acted as if she were under duress." [40], Ex. 7 at p. 4.

While in Mississippi, Allen interviewed four other Black employees with complaints about Winstead: Johnson-Davidson, Tiana Horton, Jethro Millsap, and Dennis Miller.[8] Johnson-Davidson discussed Winstead's alleged "raised racist" comment with Allen. Millsap and Miller complained that working at Aurora was like working at a plantation because the management building contained only White employees and the Black employees worked in a separate building.[9] Horton's complaint echoed McGee's complaint regarding Winstead's alleged dismissiveness.[10]

On Allen's last day at the Mississippi site, she attended an employee engagement meeting that Winstead had set up via email. Winstead did not attend the meeting, and she testified that managers typically did not attend engagement meetings. According to Winstead, she carbon copied managers on the invitation email so that they would be aware of their employees' whereabouts. Ultimately, managers Washington and Lamberson attended the engagement meeting. Johnson-Davidson told Allen that she felt Winstead purposely invited the managers to the meeting so that the employees would not speak freely.

Allen met with Winstead after the engagement meeting. At her deposition, Winstead testified that she was shocked when Allen told her that two managers attended the meeting. She

---

[8] With respect to why she interviewed these specific employees, at her deposition, Allen testified that Johnson-Davidson suggested she speak with Millsap and Miller. According to the statement Allen prepared for Aurora's internal investigation, Allen spoke to Horton after McGee told her other employees wanted to speak with her.

[9] There are varying accounts of which employee made the "plantation" comment. For example, Winstead's deposition testimony indicates that McGee made the comment. In any event, the parties agree that at least one employee told Allen that the Columbus site was like a plantation.

[10] Notably, Tiana Horton was one of the IT employees whose immediate recognition award Winstead did not immediately approve. Winstead also alleged at her deposition that Horton had ill feelings toward her because Horton's boyfriend had been terminated from Aurora and Winstead would have been present during the termination.

alleged that she "knew immediately what [Johnson-Davidson] was going to think." [36], Ex. 1 at p. 126. During this conversation with Allen, Winstead discussed her "concern with [Johnson-Davidson] and all the racial things that were going on." *Id.* at p. 127. Winstead further expressed her "concern about [her] values aligning with the [Aurora] values, because [she] felt that the company was trying to implement affirmative action." *Id.* Winstead testified that she did not specifically discuss diversity initiatives with Allen, but she told her that there were values that Aurora had that she may not agree with, including COVID vaccinations and using the bulletin board in ways for which it was not designed. Following this conversation with Allen, Winstead took a few days off and returned to the site on April 8, 2022.

In the meantime, Allen returned to Manassas and met with McElwain to discuss her concerns about Winstead. Allen and McElwain met with Erin Laruffa (White), Aurora's in-house counsel, to discuss Winstead. Allen and McElwain initially proposed putting Winstead on a performance improvement plan. However, Laruffa advised that it would be okay to terminate Winstead right away. At her deposition, McElwain testified that Winstead was terminated in part for creating racial disparities, which resulted in complaints from Black employees and the resignation of a Black employee. McElwain further testified that she decided to terminate Winstead due to the lack of judgment she displayed when she admitted that she did not share Aurora's values and failed to follow instructions to approve the immediate recognition awards, the perception of employees, and the sharing of protected health information.

On April 8, 2022, Allen called Winstead and terminated her over the phone. At her deposition, Winstead testified that Allen told her that as the only HR professional on site, she was responsible for setting the environment of the site. Allen allegedly told Winstead that she was terminated because she "set the environment of a plantation." *Id.* at p. 134.

Following her termination, Winstead contacted the Boeing Ethics Hotline to request an internal investigation into her termination. Winstead alleged that she was terminated due to her age and religious beliefs—the latter related to a request for a religious exemption from the COVID vaccination. Boeing Investigator Amy Bartram investigated Winstead's claims by reviewing emails and interviewing and taking statements from Winstead, Allen, and McElwain. At the conclusion of her investigation, Bartram prepared a report with findings. According to Winstead's statement included in Bartram's report, Winstead believed that she was discharged "because it was perceived that [she] treated Black employees differently," which she alleged was not true. [40], Ex. 7 at p. 2. Winstead further alleged that Johnson-Davidson, Colville, and Jeanne Pushis (Colville's executive assistant and friend of Johnson-Davidson), among others, did not like her and fabricated information about her. As part of this litigation, Winstead submitted the deposition testimony of several Black employees who testified that Winstead treated them fairly.

Bartram ultimately found that Winstead's claims of age and religious discrimination were "unsubstantiated." [40], Ex. 7 at p. 1. Bartram's report concluded that "Winstead was dismissed due to her performance, specifically allowing and contributing to racial and ethnic disparities, which resulted in complaints from numerous black employees and the resignation of a black employee." *Id.*

Three months after Winstead was terminated, Aurora hired a Black candidate to fill her position, though she was later laid off during a restructuring.

Winstead subsequently filed suit in this Court, alleging that she was terminated based on her race. Aurora now moves for summary judgment as to Winstead's claim. Winstead opposes the Motion [36].

*Legal Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

Title VII and Section 1981 make it unlawful to terminate an employee because of her race. *See* 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981. Winstead's race discrimination claim relies on circumstantial evidence and is therefore subject to the familiar *McDonnell Douglas* burden-shifting framework. *See Harville v. City of Houston, Miss.*, 945 F.3d 870, 874 (5th Cir. 2019) (citations omitted). This approach applies to discrimination claims arising under both Title VII and Section 1981. *See Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022) (citing *Sanders v. Christwood*, 970 F.3d 558, 561 n. 7 (5th Cir. 2020)) (additional citations omitted). However, to succeed on a Section 1981 claim, a plaintiff must satisfy the more stringent "but-for" causation standard. *Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 325 (5th Cir. 2020) ("Although similar in some respects to Title VII, 42 U.S.C. § 1981 requires plaintiff's showing but-for causation.") (citing *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 331, 140 S. Ct. 1009, 206 L. Ed. 2d 356 (2020)).

Under the *McDonnell Douglas* framework, "[Winstead] must first make a prima facie case of race discrimination, and then the burden of production shifts to [Aurora] to proffer a legitimate, nondiscriminatory reason for his action." *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021) (citing *Outley v. Luke & Assoc., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016)). If Aurora satisfies its burden, "the presumption of discrimination disappears." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (citing *David v. Dall. Area Rapid Transit*, 838 F.3d 309, 317 (5th Cir. 2004)). Winstead must then offer sufficient evidence to create a genuine issue of material fact either (1) that [Aurora's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [Aurora's] reason, while true, is only one of the reasons for its conduct,

and another 'motivating factor' is [Winstead's] protected characteristic (mixed-motives alternative)." *Id.* (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 308 (5th Cir. 2004)).

I.      *Prima Facie Case*

To establish a prima facie case of race discrimination, Winstead must show that she "(1) is a member of a protected class, (2) was qualified for the position that she held, (3) was subject to an adverse employment action, and (4) was replaced by someone outside of her protected class or treated less favorably than other similarly situated employees who were not in her protected class." *Harville*, 945 F.3d at 875 (citing *Alkhawaldeh v. Dow Chemical Co.*, 851 F.3d 422, 426 (5th Cir. 2017)). The parties do not dispute that Winstead has produced sufficient evidence to establish a prima facie case.

II.     *Legitimate, Non-Discriminatory Reason*

Aurora now must proffer a legitimate, non-discriminatory reason for terminating Winstead. *Id.* "To meet its burden, [Aurora] 'must clearly set forth, through the introduction of admissible evidence, the reasons for [Winstead's] firing.'" *Vaughn*, 665 F.3d at 636 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). Winstead argues that Aurora "has not provided any competent evidence from the decision-maker (the corporate attorney) as to why Winstead was discharged. The two (2) HR employees recommended Winstead be given a performance improvement plan, but their recommendations were vetoed by the corporate attorney who said it would be 'okay' to discharge Winstead. . . The corporate attorney was not called to testify. Therefore, the decision-maker, the attorney, has not articulated any reason." [41] at p. 9.

For its part, Aurora points to evidence that McElwain made the decision to terminate Winstead. At her deposition, McElwain specifically testified that "[she] made the decision." [36],

13

Ex. 2 at p. 15. McElwain further explained that when Laruffa said it would be okay to discharge Winstead, "that was just her legal advice and not a directive." *Id.* at p. 22. Winstead points to no evidence to dispute that McElwain was the decisionmaker. Winstead's argument that Aurora has put forth no evidence to satisfy its burden is rejected.

Aurora contends that Winstead was terminated because she "demonstrated a pattern of poor judgment through a series of events in early 2022." [37] at p. 13. As to the reasoning behind her decision, McElwain testified as follows:

> Q. Earlier in the deposition, I read you – from this statement by Amy Bartram, the investigator, concerning their findings. And it says. . . "Winstead was dismissed due to her performance, specifically allowing and contributing to race – racial and ethnic disparities," to read the whole thing, "which resulted in complaints from numerous Black employees and the resignation of a Black employee."
>
> That's what Ms. Bartram wrote. Now, did you say you agree with that or you don't agree with it?
>
> A. I partially agree with that statement.
>
> Q. Okay. So does that – do you have other reasons, then, that she was fired, that that statement – that's not covered in the statement?
>
> A. Yes.
>
> Q. Okay. What are your other reasons?
>
> A. Lisa shared some protected health information about an employee with a manager who didn't have a need to know.
>
> . . .
>
> Q. . . . So racial disparities and the fact that – that – that she had said something about Sarah having a reaction to the vaccine, those are the two primary reasons.
>
> Are there any minor reasons that – that are also – you want to tell us about?

A.      Embedded into the – what you're classifying as the racial portion is the not following instructions to improve – to approve those recognition awards.

. . .

Q.      . . . and we covered the reasons that you – that you made the decision to fire?

A.      The only one that we excluded was Lisa's own statement that she didn't think that she could be successful at Aurora because of her own views and the hesitancy to be able to change those at work aligned with Aurora values, and her own statement that she may be unable to do that.

. . .

Q.      Why did you follow the lawyer's advice? You said you decided –

A.      Well, in general –

Q.      It sounds like –

A.      In general ours are well-trained, so I like to at least consider their advice. But we thought that it would be best to separate based on the lack of judgment that Lisa displayed in her own admission, and in the way that she handled not following instructions, and the perception of the employees that we've already talked about, and sharing protected health information, and I thought it would be too risky to continue her employment with those – lack – those judgment calls.

*Id.* at p. 57, 65-67, 69.

McElwain's stated non-discriminatory reasons (creating racial disparities, the perception of employees, failing to follow instructions, sharing protected health information, and expressing concern about her own values) are sufficient to satisfy Aurora's burden. *See, e.g., Vaughn*, 665 F.3d at 636 (finding employer proffered non-discriminatory reason for termination where

employee was terminated for comments that "created a perception of racial discrimination and uncomfortable environment due to lack of confidentiality").

### III.     Pretext

The burden now shifts back to Winstead to present "substantial evidence" that Aurora's reasons for terminating her are pretextual. *Owens*, 33 F.4th at 826 (quoting *Watkins*, 99 F.3d at 283). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded [triers] of fact in the exercise of impartial judgment might reach different conclusions." *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003)).

"A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Harville*, 945 F.3d at 879 (citing *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010)). "But employment laws do not transform federal courts into human resources managers, so the inquiry is not whether [Aurora] made a wise or even correct decision to terminate [Winstead]." *Owens*, 33 F.4th at 826 (quoting *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005)). "Instead, the ultimate determination, in every case, is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." *Id.* (quoting *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000)) (internal alterations and quotation marks omitted). "Thus, evidence must be of sufficient 'nature, extent, and quality' to permit a jury to reasonably infer discrimination." *Id.* (quoting *Crawford*, 234 F.3d at 903).

Based on McElwain's deposition testimony, Aurora's reasons for terminating Winstead are as follows: (1) contributing to racial disparities, which resulted in complaints from Black employees and the resignation of a Black employee; (2) the perception of employees; (3) failing to approve immediate recognition awards after being instructed to do so; (4) sharing an employee's

protected health information; and (5) expressing concerns over whether her values aligned with the company's values.

To demonstrate pretext, "[Winstead] must rebut *each* nondiscriminatory. . . reason articulated by [Aurora]." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007*), abrogated on other grounds by Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023) (emphasis added). While Winstead takes issue with the bulk of Aurora's reasoning, she does not dispute two of Aurora's specific proffered reasons. She is unable to carry her burden for that reason. *See Rodriguez v. Eli Lilly and Co.*, 820 F.3d 759, 765 (5th Cir. 2016) (finding plaintiff failed to demonstrate pretext where he did not dispute two of five reasons articulated by employer); *McKinney v. Bolivar Med. Cntr.*, 341 F. App'x 80, 82 (5th Cir. 2009) (plaintiff's failure to challenge one of employer's reasons "alone would be reason enough to dismiss discrimination claim because a plaintiff is required to rebut each nondiscriminatory reason articulated by his employer"). The Court will walk through the evidence as to the two undisputed reasons before turning to the mixed-motives analysis.

A. *Perception of Employees*

As noted above, when asked why she decided to terminate Winstead, McElwain noted "the perception of employees that we've already talked about." [36], Ex. 2 at p. 69. Throughout her deposition, McElwain affirmed that Winstead was terminated in part for "allowing and contributing to[] racial and ethnic disparities. . . which resulted in complaints from Black employees and the resignation of a Black employee." *Id.* at p. 57.[11] Winstead disputes that she

---

[11] Because McElwain's explanation was an adoption of Bartram's finding, the Court notes McElwain's understanding of Bartram's conclusion. When asked what Bartram meant by "racial disparities," McElwain testified that she did not write the statement but she thought Bartram "was probably referring to the employees at the site who had the concerns about Lisa and the awards and the statements that Lisa made about Black employees' pay and – things along those lines is what I suspect that she meant here." [36], Ex.

treated Black employees differently, but she does not dispute that employees *perceived* her actions as discriminatory and accordingly complained.

First, in the statement Winstead submitted to Boeing's internal investigator, Winstead alleged: "I believe I was discharged because it was perceived that I treated Black employees differently, but I do not know this for sure." [40], Ex. 7 at p. 2. In other words, while Winstead was not sure at the time if the employees' perception was the reason for her discharge, she acknowledged that the perception existed.

Second, Winstead does not dispute that several employees complained that she was treating Black employees differently. At her deposition, she consistently testified about Johnson-Davidson's complaints that she was biased and prejudiced and/or racist. *See* [36], Ex. 1 at p. 79, 81, 105-106, 116. She testified that Washington accused her of failing to approve two immediate recognition awards because the recipients were Black. *Id.* at p. 54-55. She also confirmed that McGee, Horton, and Miller complained about her, though she did not know of their complaints at the time of her termination. *Id.* at p. 129-130.

Moreover, Winstead testified that she asked employees about her demeanor because she was aware of complaints that she was biased and unapproachable:

> Q.   Right. So in 2022, though, you called employees into your office to ask them specific to you whether they thought you were racist, is that –
>
> A.   No. I said that – that people had – there had been a word that I was biased and unapproachable. What was I doing to project that image? What am I doing?
>
> Q.   Okay. Do you remember any of those conversations?

---

2 at p. 43-44. She specifically testified that Bartram was not referring to a numerical disparity, such as the racial makeup of employees. *See id.*

A.    One person said well your door is closed, but we all know that your door is closed because the mandate right now is you have to wear your mask unless your door is closed. . .

But other than that, they said I had been very supportive of them, that I had taken care of them. . .

. . .

Q.    So in January of 2022, then, you knew though that – that some African American employees at least were claiming that you were untrustworthy and that you had some racial biases, right?

A.    The only one I was aware of was Ariel.

. . .

Q.    . . . Did you ever talk with Chris McGee about any concerns he had with you?

A.    I never knew he had a problem with me. I was shocked when I found out that it was him that had said that I had created the environment of a plantation. I was shocked. Because all the interactions I had with Chris McGee were very pleasant. . .

And I had no idea about Tiana, none.

Q.    Why do you think that at least these employees claim that you were unapproachable?

A.    Okay. So the – the notes say, because I've not talked to them, but the notes you provided for us said that my door was closed, that I was unresponsive. . .

Basically, that I had made some decisions to – you know, like not approving the employee recognition because I was, you know, racist. . .

[36], Ex. 1 at p. 110-114.

Winstead further testified that she was trying to judge people "not on the color of their skin, but on. . . the content of their character. . . But [she] knew that it was not being perceived that way." *Id.* at p. 127.

The Court feels compelled to repeat that "[t]he issue at the pretext stage is not whether [the decisionmaker's] reason was actually correct or fair, but whether the decisionmakers honestly believed the reason." *Harville*, 945 F.3d at 877 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)). Winstead points to no evidence suggesting that McElwain did not honestly believe that Winstead was perceived as discriminatory.

To demonstrate pretext, Winstead essentially argues that she was not discriminating against any employees. She points to evidence regarding her subjective intent and Aurora's investigatory practices. At her deposition, Winstead provided nondiscriminatory explanations for her actions with respect to the immediate recognition awards, Johnson-Davidson's promotion, and the bulletin board. *See* [36], Ex. 1 at p. 52, 71. Winstead testified that she made those decisions based on timing and company guidelines. To support her position that she did not engage in disparate treatment, Winstead points to the deposition testimony of Black employees who contend she treated them fairly. *See* [40], Ex. 8, 9, 10. Winstead argues that Aurora should have interviewed other Black employees at the site before terminating her for creating racial disparities.

The problem with Winstead's arguments is that they are directed at an entirely different aspect of Aurora's reasoning—whether she created racial disparities by treating Black employees differently. That reason is distinguishable from the one at issue here, which is the employees' *perception* that she was making decisions based on their race. McElwain twice indicated that the "perception" or "concerns" of employees were a reason for termination. [36], Ex. 2 at p. 43-44, 69. Notably, McElwain testified that she did not know if Winstead delayed approving the

immediate recognition awards for a race-related reason, but "[i]t was a concern." *Id.* at p. 30-31. She later explained: "I am not accusing Lisa of being a racist. I am telling you that Lisa said that she was struggling to adopt Aurora's values, and her own upbringing made her concerned for being a successful HR partner at Aurora." *Id.* at p. 54-55. In other words, McElwain's testimony makes clear that she was unsure of Winstead's subjective motivations, but the parties agree that several employees perceived Winstead's decisions and comments as race-related.

Winstead has pointed to no evidence to dispute that McElwain in good faith believed that the employees perceived Winstead as discriminatory.[12] And as noted, Winstead's deposition testimony and statement to Bartram make clear that Winstead herself believed that she was perceived as discriminatory. She fails to create a factual dispute as to this aspect of Aurora's reasoning.

### B. *Winstead's Own Admission*

Next, McElwain testified that Winstead was additionally terminated due to her own statement that she may not share Aurora's values. *See* [36], Ex. 2 at p. 67. At her deposition, Winstead confirmed that she expressed those concerns. In describing her conversation with Allen after the employee engagement meeting, Winstead testified as follows:

> Q.     Excuse me. So in response to that, did you tell April Allen
> that you weren't sure you were going to – that you were right
> for the job you were in?

---

[12] The court notes that creating the perception of racial discrimination is a legitimate reason for termination. For example, in *Vaughn*, the employer allegedly fired the plaintiff, a bank manager, for making statements that created the perception of racial discrimination. 665 F.3d at 636. The employer alleged that employees complained that the plaintiff made inappropriate comments related to another employee's use of the n-word, the 2009 Presidential Inauguration, and during the interview of a White candidate who would have been working on a mostly Black team. *Id.* at 636-37. Though the Fifth Circuit found that the employer's reasoning was pretextual for reasons not applicable in this case, the court held that the proffered reason was a legitimate, nondiscriminatory reason for termination. *Id.* at 638-39.

A.    I didn't tell – let's see. We had conversations and I – about my concern with Ariel and all the racial things that were going on. Yes. I had expressed my concern about my values aligning with the Boeing values, because I felt that the company was trying to implement affirmative action and that I was a – I was trying to conduct myself in the way that MLK had mentioned, which was – or not mentioned but, you know, that's what his philosophy was.

He wanted people to be judged on – not on the color of their skin, but on their – their – the content of their character. And that's what I always tried to do. But I knew that it was not being perceived that way. And that was very upsetting to me.

And I totally understood why Ariel could see that, she could – that that could be perceived from that meeting and from Jared. I'm not stupid. I couldn't be like, well, why – why was she so upset? I understood immediately.

Q.    Yeah. So did you tell – you told April that you weren't comfortable with the diversity initiatives then?

A.    I just told her that I didn't – we never talked about diversity specifically, but I just told her that I didn't – that there were some values that Boeing obviously had, or Aurora obviously had, that I may not agree with. That included the COVID vaccinations. That included – I mean, there were several things.

It wasn't just, you know, one – one – Black History Month, putting Black History Month on the bulletin board that was designed just to be there for production employees to know exactly what was going on in other buildings. It was never designed to put information up there about personal beliefs, about parties, about, you know, elections, about, you know, minorities, about – it was – it was not designed for that. That is not why it was requested. That was not why it was started.

Q.    Did anyone ever come to you and ask to put something on the bulletin board about elections?

A.    No.

Q.    Did anyone ever come to you and ask to put something on the bulletin board of – of any other type?

22

A.      Yeah. About parties, which I disagreed with. I didn't even think that we should be having parties. I mean, I questioned the leadership's decisions at that point as well, because Luke Colville was making decisions to have Christmas parties where people didn't wear their mask when we had a mandate that everybody has to wear a mask.

. . .

Q.      Okay. Just to make sure I'm clear, though, employees were allowed to post things about parties on the bulletin board. You disagreed with it, but they were allowed to –

A.      I disagreed with it, but that – but that was something that – yeah. And – and – and people knew that I didn't – I didn't approve of all of the –

Q.      Okay.

A.      The extra crazy stuff that was going on.

[36], Ex. 1 at p. 127-29.

As Winstead has not disputed two of Aurora's nondiscriminatory reasons for termination, she is unable to demonstrate pretext. *McCoy*, 492 F.3d at 557.  Winstead's Section 1981 claim therefore fails because she is unable to prove that her race was the but-for cause of her termination. *See Comcast*, 589 U.S. at 337-38, 140 S. Ct. 1009. However, she may still overcome summary judgment on her Title VII claim by showing that her race was a motivating factor in the decision to terminate her. *Vaughn*, 665 F.3d at 636.

### IV.    Motivating Factor

As noted, according to Allen's deposition testimony, two employees reported that the Columbus site was like a 2022 plantation because the management building was all White, while the Black employees worked in other buildings. *See* [36], Ex. 3 at p. 34-35. According to Winstead's deposition testimony, McGee specifically alleged that she "created the environment of a plantation." [36], Ex. 1 at p. 113.

23

When Allen left the Mississippi facility and returned to Manassas, she immediately spoke to McElwain about the employees' complaints. *See* [40], Ex. 7 at p. 5. She reported to McElwain that the employees referred to the site as a plantation. *See* [36], Ex. 2 at p. 44. When Allen terminated Winstead over the phone, she told Winstead that "others described to [her] that [Winstead] created an environment like a 2022 plantation." [40], Ex. 7 at p. 5.

Aurora argues that "there is no evidence to show that Aurora would have acted differently had these same Black employees complained about a non-white Human Resources Business Partner. Indeed, none of the complaints that Aurora received about Winstead were about her race." [37] at p. 17. The Court disagrees. A reasonable juror could find that the complaints invoking the image of a plantation necessarily implicated Winstead's race. After all, White individuals owned and managed plantations, and the employees' complaints involved references to Winstead and White management.

It is true that an HR professional of any race can be terminated for behavior that is reasonably perceived as discriminatory. However, in light of the fact that her actions were essentially compared to those of a White plantation owner, a reasonable juror could conclude that the Winstead's race played a unique role in the way she was perceived. A reasonable juror could further conclude that Allen and McElwain placed significant weight on the plantation comment—which, again, implicates Winstead's race—because it was cited as a reason for termination *during* her termination.

Additionally, at least one of the complaints that described Aurora as a plantation did so because all of the management employees in the management building were White. A reasonable juror could find that this complaint gave Aurora a desire to change the racial makeup of the management building. A reasonable juror could especially reach this conclusion in light of the fact

that Aurora replaced Winstead with a Black HR business partner. The Court is cognizant that the characteristics of a plaintiff's replacement are generally not relevant beyond the prima facie stage. However, "the *McDonnell Douglas* methodology was 'never intended to be rigid, mechanized, or ritualistic,'" and a reasonable juror could find Winstead's replacement relevant when viewed in the context of the plantation complaints. *U.S. Postal Serv. Bd. of Gov. v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983). Employees complained about an all-White, plantation-like management building *and* about Winstead "creating the environment of a plantation." [36], Ex. 1 at p. 113. Aurora then cited one plantation complaint during Winstead's termination and replaced Winstead with a non-White candidate. Viewing all of this evidence together, a reasonable juror could conclude that Winstead's race was a motivating factor in her termination.

*Conclusion*

For the reasons set forth above, Aurora's Motion for Summary Judgment [36] is GRANTED in part and DENIED in part. Winstead's Section 1981 claim is dismissed *with prejudice*. Winstead will be permitted to proceed to trial on her Title VII claim.

SO ORDERED, this the 16th day of January, 2025.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE